[No. D039275. Fourth Dist., Div. One. May 6, 2003.]

SOUTHERN CALIFORNIA UNDERGROUND CONTRACTORS, INC.,
Plaintiff and Appellant, v.
CITY OF SAN DIEGO, Defendant and Appellant.

534

536

## COUNSEL

Andrade & Associates, Richard B. Andrade, Frank A. Satalino, W. Grey Zimmerman and Natalia Desiderio for Plaintiff and Appellant.

Casey Gwinn, City Attorney, Anita M. Noone, Assistant City Attorney, and Sim Von Kalinowski, Deputy City Attorney, for Defendant and Appellant.

**OPINION**

**AARON, J.—**

I

INTRODUCTION

These appeals follow an administrative ruling by the City of San Diego (City) to permanently debar Southern California Underground Contractors, Inc. (SoCal), from contracting with City. The debarment was based on findings of the San Diego City Council (City Council) that SoCal engaged in corrupt practices while administering public works contracts it had entered into with City. The trial court granted SoCal's petition for writ of administrative mandamus (Code Civ. Proc., § 1094.5), concluding that the decision to permanently debar SoCal constituted an abuse of discretion and an act in excess of City's authority because SoCal had not engaged in any practices, corrupt or otherwise, involving the "administration" of its contracts with City, but rather had engaged in such practices only in the "performance" of the contracts. Accordingly, the court ordered City to adopt its proposed alternative resolution to debar SoCal for a period of three years. The court rejected SoCal's claim that the debarment proceeding denied SoCal its rights to procedural due process and to a fair hearing before an impartial tribunal.

In its appeal, SoCal does not challenge the sufficiency of the evidence supporting the findings upon which the debarment was based. Rather, SoCal contends it was not given a full and fair opportunity to defend itself. Specifically, SoCal maintains it was denied the right to confront and cross-examine adverse witnesses and the right to present live testimony before an impartial tribunal. City also appeals, contending the court erred in finding that SoCal had not engaged in corrupt practices involving the "administration" of contracts and that its order for permanent debarment was thus proper.

We conclude that the debarment proceeding afforded SoCal due process and a fair hearing before an impartial tribunal, and affirm the judgment in this respect. However, we further conclude that SoCal's corrupt practices involved the "administration" of City contracts so as to warrant permanent debarment. Accordingly, we reverse the judgment insofar as it imposes on SoCal a three-year debarment rather than a permanent one.

## II

### FACTUAL AND PROCEDURAL BACKGROUND[1]

SoCal is a contractor that specializes in public underground construction projects. In June 2000, while working on 11 projects for City, SoCal was debarred[2] for engaging in "corrupt practices involving the administration or award of a contract with the City . . . ." (San Diego Mun. Code,[3] § 22.0803(b).) The debarment was based on City Council's findings, made after a hearing, that SoCal had engaged in a pattern of willful acts of corruption and deception, unethical and unacceptable business practices, and inadequate contract performance on numerous public works contracts with City. In the three weeks before the debarment hearing, City provided SoCal with a written factual basis and supporting evidence for the proposed debarment, and made available for review and copying all project files for the contracts upon which the proposed debarment was based. At the request of SoCal, City also made available for deposition six of its inspectors to testify as to the allegations supporting the debarment.

After the City Council rendered its decision to permanently debar SoCal, SoCal filed a petition for writ of administrative mandamus, challenging the debarment. While the writ was pending, SoCal filed a multimillion-dollar

---

[1]In order to thoroughly and fairly state the factual and procedural background, pursuant to Evidence Code section 459, we grant the following requests for judicial notice:

 A. SoCal's request for judicial notice filed June 21, 2002, of the original complaint entitled *Southern California Underground Contractors, Inc. v. City of San Diego* (Super. Ct. San Diego County No. GIC754273).

 B. SoCal's request for judicial notice, filed September 19, 2002, of:

 (i) Complaint entitled *Southern California Underground Contractors, Inc. v. City of San Diego* (Super. Ct. San Diego County, No. GIC750233);

 (ii) March 14, 2001, order granting petitioner's motion for reinstatement in *Southern California Underground Contractors, Inc. v. City of San Diego* (Super Ct. San Diego County, No. 750233);

 (iii) Administrative Record Index for June 2000 Permanent Debarment of Southern California Underground Contractors, Inc.;

 (iv) City of San Diego City Charter, article VII;

 (v) City of San Diego, resolution No. R-289704, adopted February 2, 1998;

 (vi) San Diego City Council's meeting minutes from 1979 through 2000.

 C. City's request for judicial notice filed October 10, 2002, of:

 (i) San Diego Superior Court case No. 750233 ruling filed March 23, 2001;

 (ii) San Diego Superior Court case No. 754273, City's answer to plaintiff's unverified complaint, filed October 10, 2000.

[2]" 'Debarment' means action taken by the City Council to exclude a contractor from contracting with the City for a reasonable, specified period." (San Diego Mun. Code, § 22.0802.)

[3]All code references are to the San Diego Municipal Code unless otherwise specified.

lawsuit against City in which it alleged that the debarment was illegal. In issuing the writ, the court remanded the debarment matter to the City Council for a rehearing, based upon its finding that SoCal had not been afforded adequate time to prepare a defense, and thus had been denied due process. The court ordered that another hearing be set no sooner than 45 days from the date of the court's ruling.

City scheduled the second debarment hearing for May 22, 2001, 60 days after the court's ruling. On April 9, 2001, City served SoCal with manager's report No. 01-168, in which the factual basis for the proposed debarment was set forth, together with supporting documents. The proposed debarment was based on the same charges that were raised in the June 2000 proceeding: (1) falsifying traffic control permits; (2) working in the public right-of-way without traffic control plans or appropriate traffic control, on numerous occasions; (3) taking water from city fire hydrants without having water meters, and using meters that were either inoperable or had been reported missing (so the use of water could not be billed); (4) misrepresenting that work had been completed, and attempting to cover up the misrepresentation; (5) submitting numerous false claims for extra work, at significantly inflated labor rates; (6) submitting false claims for inflated rates on equipment (by physically altering equipment model numbers); and (7) submitting false workers' compensation claims from City's owner-controlled insurance program.

Before the second hearing, SoCal took 13 additional depositions of City employees. City informed SoCal it could dispute the proposed debarment through a combination of submitting written materials to the City Council and making an oral presentation to the City Council. SoCal was given the right to submit unlimited written materials, including legal briefs, witness declarations and deposition transcripts. City advised SoCal that in order to ensure a full and fair opportunity to be heard before the City Council, SoCal should present its complete position in writing in advance of the hearing, together with all supporting documentation. SoCal was further informed that "[f]air opportunity for testimony will be accorded subject to the regular meeting rules and discretion of the City Council. If SoCal wishes to have written materials considered, please ensure delivery to the City Clerk in order for the City Council members to review it prior to the debarment hearing." City twice reminded SoCal that SoCal had the right to submit unlimited written materials. With regard to the right to cross-examine witnesses, City pointed out that SoCal had been afforded the opportunity to cross-examine witnesses during their depositions, and that SoCal could present this testimony at the City Council hearing through written statements, declarations and deposition transcripts.

SoCal, through its counsel, submitted nearly 400 pages of written materials to the city clerk at 4:13 p.m. on the day prior to the scheduled debarment hearing. At the May 22, 2001 hearing, counsel for SoCal was allowed 40 minutes to present SoCal's case. The hearing was continued for one week to allow time for the members of the City Council to review SoCal's written submissions. SoCal was also permitted to, and did, submit a supplemental brief and additional deposition transcripts after the hearing. At the continued hearing on May 29, 2001, SoCal's attorney made another 40-minute oral presentation.

Following the hearings, the City Council adopted a resolution permanently debarring SoCal. The City Council made an alternative motion to debar SoCal for three years in the event a court were to overturn the permanent debarment.

SoCal filed its administrative mandamus petition in the superior court, challenging the procedural aspects of the debarment and claiming that City had acted beyond its statutory authority in permanently debarring SoCal. The court rejected SoCal's due process argument, finding that SoCal had been afforded ample opportunity to conduct discovery, present evidence and cross-examine adverse witnesses prior to the debarment hearing. The court further found that SoCal had not met its burden of showing it had been denied due process on the grounds that certain members of the City Council failed to consider SoCal's evidence, or that the City Council was biased because SoCal had filed a lawsuit against City.

However, the court granted SoCal's petition for writ of mandate on the ground that the decision to permanently debar SoCal under section 22.0803(b) for corrupt practices involving the "administration" of a contract constituted an abuse of discretion and an act in excess of City's authority. In distinguishing between the terms "administration" of a contract and "performance" of a contract as used in section 22.0803(a) and (b), the court found SoCal had not engaged in *any* practices, corrupt or otherwise, involving the *administration* of contracts. Rather, the court found, SoCal had provided unsatisfactory "performance" under the contracts. The court concluded that SoCal's unsatisfactory performance, together with its demonstrated lack of business integrity, warranted a three-year debarment under section 22.0803(a). Accordingly, the court ordered City to vacate its decision permanently debarring SoCal, and to adopt a resolution debarring SoCal for a period of three years.

## III

### SoCal's Appeal

*Discussion*

1. *The Debarment Proceeding Before the City Council Satisfied the Requirements of Due Process*

 a. *SoCal Was Not Entitled to a Full Evidentiary Hearing Before the City Council*

SoCal contends the debarment proceeding before the City Council was fundamentally unfair and resulted in a denial of due process because SoCal was not allowed to present live rebuttal testimony or to cross-examine adverse witnesses. SoCal asserts that being afforded only the opportunity to provide written submissions and to make a limited oral presentation does not satisfy the requirements of due process.

The ultimate determination whether an administrative proceeding was fundamentally fair is a question of law to be decided on appeal. (*Rosenblit v. Superior Court* (1991) 231 Cal.App.3d 1434, 1443 [282 Cal.Rptr. 819].) Thus, we independently evaluate SoCal's claims that it was denied a fair hearing. (*Id.* at p. 1444; *San Diego County Deputy Sheriffs Assn. v. San Diego County Civil Service Com.* (1998) 68 Cal.App.4th 1084, 1086 [80 Cal.Rptr.2d 712].)

Debarment excludes an individual or entity from doing business with the government as a result of wrongful conduct or violations of a public contract or program. (*Golden Day Schools, Inc. v. State Dept. of Education* (2000) 83 Cal.App.4th 695, 703 [99 Cal.Rptr.2d 917].) Although debarment can have a severe economic impact on contractors, it "is not intended as punishment. It is, instead, a necessary means to enable the contracting governmental agency to deal with irresponsible bidders and contractors, and to administer its duties with efficiency." (*Id.* at p. 704, citing *Gonzalez v. Freeman* (D.C. Cir. 1964) 334 F.2d 570, 577.) However, because debarment implicates a liberty interest, a contractor has a due process right to a fair hearing when a government entity seeks to debar it from contract eligibility. (*Golden Day Schools, Inc. v. State Dept. of Education, supra,* 83 Cal.App.4th at p. 711; *Stacy & Witbeck, Inc. v. City and County of San Francisco* (1995) 36 Cal.App.4th 1074, 1086, fn. 6 [44 Cal.Rptr.2d 472].) Although a government contractor cannot be debarred without procedural safeguards, there is no constitutional entitlement to the full panoply of judicial trial procedures

such as cross-examination. (*Stacy & Witbeck, Inc. v. City and County of San Francisco, supra,* 36 Cal.App.4th at p. 1087.)

(3) Due process is the opportunity to be heard at a meaningful time and in a meaningful manner. (*Mathews v. Eldridge* (1976) 424 U.S. 319, 333 [96 S.Ct. 893, 901-902, 47 L.Ed.2d 18].) Unlike some legal rules, due process " 'is not a technical conception with a fixed content unrelated to time, place and circumstance.' [Citation.]" (*Id.* at p. 334 [96 S.Ct. at p. 902].) Rather, it " 'is flexible and calls for such procedural protections as the particular situation demands.' [Citation.]" (*Ibid.*) Determining whether a particular administrative procedure is constitutionally sufficient requires analysis of the governmental and private interests involved: (1) the private interest that will be affected by the official action; (2) the risk of an erroneous deprivation of such interest through the procedures used and any probable value of additional or substitute procedural safeguards; and (3) the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail. (*Id.* at p. 335 [96 S.Ct. at p. 903].)

█ SoCal cites *Goldberg v. Kelly* (1970) 397 U.S. 254, 269 [90 S.Ct. 1011, 1021, 25 L.Ed.2d 287] to support its position that due process requires that it be afforded the opportunity to confront and cross-examine adverse witnesses at the debarment hearing before the City Council. In *Goldberg,* New York City welfare recipients challenged the adequacy of procedures for notice and hearing in connection with the termination of their public assistance payments. While acknowledging that some governmental benefits may be administratively terminated without affording the recipients a pretermination evidentiary hearing, the Supreme Court held that due process required such a hearing when public assistance payments to welfare recipients may be discontinued. (*Id.* at p. 264 [90 S.Ct. at pp. 1018-1019].) Significantly, in arriving at this conclusion, the court stated: "[T]he crucial factor in this context—*a factor not present in the case of the blacklisted government contractor,* . . . is that termination of aid pending resolution of a controversy over eligibility may deprive an eligible recipient of the very means by which to live while he waits. Since he lacks independent resources, his situation becomes immediately desperate. His need to concentrate upon finding the means for daily subsistence, in turn, adversely affects his ability to seek redress from the welfare bureaucracy." (*Ibid.,* italics added.) The court held that as applied to the particular characteristics of a welfare recipient, principles of due process required "timely and adequate notice detailing the reasons for a proposed termination, and an effective opportunity to defend by confronting any adverse witnesses and by presenting

his own arguments and evidence orally." (*Id.* at pp. 267-268 [90 S.Ct. at p. 1020].)

Noting that New York City's procedures did not permit welfare recipients to present evidence orally or to confront and cross-examine witnesses, the court in *Goldberg* explained the context of its holding: "The opportunity to be heard must be tailored to the capacities and circumstances of those who are to be heard. It is not enough that a welfare recipient may present his position to the decision maker in writing or second-hand through his caseworker. *Written submissions are an unrealistic option for most recipients, who lack the educational attainment necessary to write effectively and who cannot obtain professional assistance.*" (*Goldberg v. Kelly, supra*, 397 U.S. at pp. 268-269 [90 S.Ct. at p. 1021], italics added.) Further, written submissions do not provide the "flexibility of oral presentations" or "permit the recipient to mold his argument to the issues the decision maker appears to regard as important." (*Id.* at p. 269 [90 S.Ct. at p. 1021].) Thus, a welfare recipient "must be allowed to state his position orally. Informal procedures will suffice; in this context due process does not require a particular order of proof or mode of offering evidence. [Citation.]" (*Ibid.*) Additionally, the court held, due process requires that welfare recipients be afforded the opportunity to confront and cross-examine adverse witnesses. (*Id.* at pp. 269-270 [90 S.Ct. at pp. 1021-1022].)

Here, as noted in *Goldberg*, the administrative procedure followed did not deprive SoCal of "the very means by which to live . . . ." (*Goldberg v. Kelly, supra*, 397 U.S. at p. 264 [90 S.Ct. at p. 1018].) SoCal is a sophisticated business entity and had the professional assistance of counsel. SoCal was given "timely and adequate notice detailing the reasons for a proposed [debarment]." (*Goldberg v. Kelly, supra*, 397 U.S. at pp. 267-268 [90 S.Ct. at p. 1020].) SoCal was afforded an effective opportunity to confront adverse witnesses at depositions. And, unlike the welfare recipients in *Goldberg*, SoCal was able, through its counsel, to effectively present its position in writing, and present arguments and evidence orally before the decision maker. (*Id.* at pp. 268-269 [90 S.Ct. at pp. 1020-1021].) The procedure followed here was tailored to SoCal's "capacities and circumstances," and thus provided sufficient due process safeguards. (*Goldberg v. Kelly, supra*, 397 U.S. at p 269 [90 S.Ct. at p. 1021].)

In *Mathews v. Eldridge, supra*, 424 U.S. 319, the Supreme Court addressed the issue whether due process required an evidentiary hearing in the context of an administrative termination of disability benefits. (*Id.* at pp. 345-346 [96 S.Ct. at pp. 907-908].) The court distinguished *Goldberg*,

where "welfare assistance is given to persons on the very margin of subsistence," noting that eligibility for disability benefits is not based on financial need. (*Id.* at p. 340 [96 S.Ct. at p. 905].) Accordingly, "there is less reason here than in *Goldberg* to depart from the ordinary principle, established by our decisions, that something less than an evidentiary hearing is sufficient prior to adverse administrative action." (*Id.* at p. 343 [96 S.Ct. at p. 907].)

In considering the fairness and reliability of the existing administrative procedures for disability recipients, the *Mathews* court observed that the potential value of an evidentiary hearing was substantially less than in the welfare context. The court noted that written submissions provide the disability recipient with an effective means of communicating his case to the decision maker. The state agency identifies with particularity the information relevant to the entitlement decision, and information critical to that decision is ordinarily derived from medical sources. These sources are likely to be able to communicate more effectively through written documents than are welfare recipients or lay witnesses. (*Mathews v. Eldridge, supra,* 424 U.S. at p. 345 [96 S.Ct. at pp. 907-908].) In addition, before benefits are terminated, the disability recipient is afforded full access to the information relied on by the state agency. The recipient is given reasons for the tentative assessment and an opportunity to submit additional arguments and evidence. (*Id.* at pp. 345-346 [96 S.Ct. at pp. 907-908].) The court found that this procedure enables "the recipient to 'mold' his argument to respond to the precise issues which the decision maker regards as crucial." (*Id.* at p. 346 [96 S.Ct. at p. 908].)

Moreover, the *Mathews* court noted, requiring an evidentiary hearing in all cases before terminating disability benefits would entail fiscal and administrative burdens out of proportion to any countervailing benefits. Further, the court observed that "[t]he judicial model of an evidentiary hearing is neither a required, nor even the most effective, method of decisionmaking in all circumstances." (*Mathews v. Eldridge, supra,* 424 U.S. at p. 348 [96 S.Ct. at p. 909].) All that is necessary to comport with due process "is that the procedures be tailored, in light of the decision to be made, to 'the capacities and circumstances of those who are to be heard,' [citation] . . . to insure that they are given a meaningful opportunity to present their case." (*Id.* at p. 349 [96 S.Ct. at p. 909].)

■ Here, the administrative proceeding in which SoCal participated comported fully with the requirements of due process, as articulated by the court in *Mathews*. The manager's report identified with particularity the information relevant to the proposed debarment and summarized City's

evidence against SoCal. City provided supporting documents upon which it would rely, and allowed SoCal to review City's complete files pertaining to the subject contracts, prior to the debarment hearing.[4] SoCal was given the opportunity to conduct discovery, and was permitted to present unlimited documentary evidence, witness statements in the form of declarations, and the testimony of adverse witnesses it had cross-examined. Through its written arguments, both factual and legal, SoCal was able to respond to the specific charges underlying the proposed debarment. (*Mathews v. Eldridge, supra*, 424 U.S. at p. 346 [96 S.Ct. at p. 908].) In addition to providing written submissions, SoCal was afforded the opportunity to make two oral presentations, to "mold [its] argument" to the issues City regarded as important. (*Goldberg v. Kelly, supra*, 397 U.S. at p. 269 [90 S.Ct. at p. 1021].) In sum, SoCal had a meaningful opportunity to be heard and thus received due process.

SoCal cites *Golden Day Schools, Inc. v. State Dept. of Education, supra*, 83 Cal.App.4th at page 706, for the proposition that due process required that it have been allowed to present live testimony and to cross-examine adverse witnesses at the hearing before the City Council. In *Golden Day*, the court held that a child care contractor with the state, debarred from applying for further contracts for three years, had a due process liberty interest entitling it to a hearing regarding the justification for the debarment. (*Id.* at pp. 708-709.) The procedures afforded in that case consisted of review of the contractor's written submissions and an oral presentation during which the contractor or its representative had the opportunity to argue or explain any material submitted in its response. The review panel could set reasonable limits on the scope of the presentation. (*Id.* at p. 700.)

In addressing the contractor's claim that the hearing was unfair because the contractor was not permitted to cross-examine adverse witnesses, the court in *Golden Day* noted that the contractor had not sought to cross-examine anyone. However, the court held that the contractor should have been allowed the opportunity to cross-examine staff persons who had participated in the determination that led to the debarment recommendation. The court ultimately remanded the matter for a new hearing before a panel member who had not participated in the initial decision. (*Golden Day Schools, Inc. v. State Dept. of Education, supra*, 83 Cal.App.4th at p. 711.)

Here, unlike in *Golden Day*, SoCal did have the opportunity to cross-examine City employees who participated in the investigation leading to its

---

[4]SoCal does not challenge the sufficiency of the notice it received, the specificity of the charges against it, or the access to information it was granted.

debarment. SoCal took the depositions of adverse witnesses and was able to present their deposition testimony to the City Council, and to highlight in its written briefs and oral presentation any inconsistencies, faulty memory or bias on the part of these witnesses.

Nothing in *Golden Day* or other case law requires that cross-examination occur at the hearing before the City Council rather than at a deposition. " 'In the vast bulk of circumstances, the procedures chosen by the legislature or by the agency are likely to be based on application of a *Mathews*-type cost-benefit test by an institution positioned better than a court to identify and quantify social costs and benefits. A court should give serious consideration to second-guessing a legislative or agency choice of procedures only when it has indications that the agency or legislature chose its procedures in bad faith or without considering the implications of its choice of procedures' . . . . [¶] . . . 'In assessing what process is due . . . , substantial weight must be given to the good-faith judgments of the [agency].' [Citation.]" (*Mohilef v. Janovici* (1996) 51 Cal.App.4th 267, 288-289 [58 Cal.Rptr.2d 721], italics omitted.)

 SoCal offers no evidence to support the conclusion that the City Council chose the procedures followed at the debarment hearings in bad faith, or that it failed to consider the implications of its choices. In the absence of such evidence, the court must give great deference to City Council's choice of procedures.

b. *SoCal Was Not Entitled to Receive Due Process Protections Set Forth in the Code of Federal Regulations or Government Code Section 11425.10*

Citing the Code of Federal Regulations, SoCal asserts that City's debarment proceeding did not comply with minimum due process standards required by federal law. However, the Code of Federal Regulations applies to administrative agencies of the federal government, not to municipalities or local agencies. (See 44 U.S.C. § 1510.)

Similarly, the provisions of the Government Code cited by SoCal apply to "state boards, commissions, and officers," and not to local entities. (Gov. Code, §§ 11410.30, 11500, subd. (a).) Even if Government Code section 11425.10 applied, here, SoCal did receive "notice and an opportunity to be heard, including the opportunity to present and rebut evidence."

c. *SoCal Was Afforded the Opportunity to Effectively Participate in the Debarment Hearing*

SoCal asserts City did not follow its own "specific uniform procedures" under the San Diego Municipal Code, such as providing "an opportunity to

participate in the administrative hearing . . . ." (§ 12.0402(a).) However, as we previously discussed, SoCal was afforded the opportunity to, and did, fully participate in the administrative hearing.

SoCal compares the procedure for debarment with the procedure for bid protest hearings, which allows for presentation of live testimony and cross-examination of witnesses, and argues that it should have been afforded the opportunity to present live testimony and cross-examination. The procedures for administrative enforcement hearings such as bid protests require the appointment of a hearing officer. (§ 12.0401 et seq.) In contrast, debarment is determined by the City Council, which determines the procedures to be followed. (§§ 22.0101, 22.0803(b).) The court will not second-guess City's choice of procedures to carry out its various functions, as long as those procedures comport with the requirements of due process. In assessing what process is due, we accord substantial weight to City's good faith judgments. (*Mohilef v. Janovici, supra,* 51 Cal.App.4th at p. 289.)

## 2. *This Court Presumes the City Council Considered All Evidence Offered by SoCal*

SoCal contends that allowing written submission of briefs was an unsatisfactory method of resolving City's debarment decision because there was no guarantee the members of the City Council would review these materials. However, City is entitled to the benefit of the presumption that its official duty has been regularly performed. (Evid. Code, § 664; *Gentry v. City of Murrieta* (1995) 36 Cal.App.4th 1359, 1385 [43 Cal.Rptr.2d 170].) Following the presentations at the original hearing on May 22, 2001, the debarment hearing was continued for one week specifically to allow the City Council additional time to thoroughly review the documents submitted, including exhibits.

We presume City considered all of SoCal's evidence, as it was required to do, in arriving at its debarment decision. Comments by certain City Council members cited by SoCal are taken entirely out of context and do not support SoCal's speculative argument that the written submissions were not read, or that only a cursory review of the materials was made. Further, it is not within the province of the court to inquire into what evidence was or was not examined or relied on by a council member in reaching his or her decision. (*City of Fairfield v. Superior Court* (1975) 14 Cal.3d 768, 777 [122 Cal.Rptr. 543, 537 P.2d 375].)

## 3. *SoCal Received a Hearing Before an Unbiased Tribunal*

SoCal contends it did not receive a hearing before a reasonably impartial, noninvolved tribunal because City was both prosecutor and adjudicator, and

at the same time, was a defendant in SoCal's pending lawsuit for damages. Preliminarily, we note that SoCal failed to raise this issue at the debarment hearing. An issue not raised at an administrative hearing, including a claim of bias, may not be raised in later judicial proceedings. (*Anton v. San Antonio Community Hospital* (1977) 19 Cal.3d 802, 826 [140 Cal.Rptr. 442, 567 P.2d 1162]; *Chevrolet Motor Division v. New Motor Vehicle Bd.* (1983) 146 Cal.App.3d 533, 539 [194 Cal.Rptr. 270].)[5]

 In any event, in this context, a party claiming that the decision maker was biased must show actual bias, rather than the appearance of bias, to establish a fair hearing violation. (*Andrews v. Agricultural Labor Relations Bd.* (1981) 28 Cal.3d 781, 791-794 [171 Cal.Rptr. 590, 623 P.2d 151].) "[B]ias in an administrative hearing context can never be implied, and the mere suggestion or appearance of bias is not sufficient. [Citation.] It is also well established that a party is not denied an impartial adjudicator merely because an administrative entity performs both the functions of prosecutor and judge. [Citation.] Overlapping investigatory, prosecutorial and adjudicatory functions do not necessarily deny a fair hearing and are common before most administrative boards. [Citations.]" (*Hongsathavij v. Queen of Angels etc. Medical Center* (1998) 62 Cal.App.4th 1123, 1142 [73 Cal.Rptr.2d 695].)

 SoCal further asserts City was biased because it was named as a defendant in SoCal's multimillion-dollar lawsuit alleging improper debarment. Although the probability of bias can arise from "the pecuniary interests of board members" (*Gai v. City of Selma* (1998) 68 Cal.App.4th 213, 225 [79 Cal.Rptr.2d 910]), the individual City Council members are not named as defendants in SoCal's lawsuit, and thus have no personal pecuniary interest in the outcome of that case. Further, any financial impact of the lawsuit against City is remote, contingent and uncertain, and is thus insufficient to constitute the type of pecuniary interest necessary to disqualify City from participating in the debarment proceedings. (See *Central & West Basin Water etc. Dist. v. Wong* (1976) 55 Cal.App.3d 191, 194 [127 Cal.Rptr. 448].) Nor is there evidence of any financial gain to City from debarment, which "is designed to protect the City by ensuring full and open competition by granting awards only to responsible contractors." (§ 22.0801.)

This case does not implicate due process limitations on pecuniary conflicts of interest. Debarment decisions are vested exclusively in the City

---

[5]In its reply brief, SoCal claims it asked City to provide an independent body to hear the debarment proceeding and also asked the trial court to hear it, but both refused. However, nothing in the record before us supports this claim.

Council. (§§ 22.0101, 22.0803(b).) ▪ Where, as here, "an administrative body has a duty to act, and is the only entity capable of acting, the fact that the body may have an interest in the result does not disqualify it from acting. The rule of necessity precludes a claim of bias from the structure of the process." (*Hongsathavij v. Queen of Angels etc. Medical Center, supra,* 62 Cal.App.4th at pp. 1142-1143.)

### 4. *Conclusion*

▪ Having analyzed the private and governmental interests at stake and the nature of the debarment procedures, we conclude SoCal was afforded due process. (*Mathews v. Eldridge, supra,* 424 U.S. at p. 334 [96 S.Ct. at pp. 902-903].) Although the private interest in this case is considerable because of the severe economic impact of debarment (*Golden Day Schools, Inc. v. State Dept. of Education, supra,* 83 Cal.App.4th at pp. 703-704), City has established a review and hearing procedure that assures fairness and reliability before a debarment· decision is made. Allegations were made, and evidence presented, that SoCal engaged in corrupt practices in the administration of its contracts with City. SoCal received an administrative review in the form of a hearing. This procedure afforded SoCal an effective opportunity to defend, including the ability to conduct discovery, present unlimited documentary evidence, cross-examine adverse witnesses at their depositions, present witness statements and testimony, submit written argument and make an oral presentation before the decision maker. Given these procedural protections, the risk of an erroneous deprivation of SoCal's interests was minimal. Finally, City's interest in dealing with irresponsible contractors and administering its duties with efficiency is substantial. In view of the fiscal and administrative burdens additional procedural safeguards would impose, such safeguards are not warranted. Under the test set forth in *Mathews,* SoCal received a fair hearing.

IV

CITY'S APPEAL

*Discussion*

*City's Permanent Debarment of SoCal Was Proper Since SoCal Was Engaged in Both the Performance and Administration of Its Contracts with City*

▪ City contends the court erred by granting SoCal's petition for writ of mandate directing the City Council to vacate its resolution permanently

debarring SoCal and to adopt an alternative resolution debarring SoCal for a period of three years. City asserts the City Council properly exercised its discretion to permanently debar SoCal for "corrupt practices involving the *administration* . . . of a contract . . . ." within the meaning of section 22.0803(b). (Italics added.)

In resolving this issue, we must interpret the term "administration" as used in the context of the debarment provision of the municipal code. ■ The interpretation and application of a statutory scheme to an undisputed set of facts is a question of law subject to de novo review on appeal. (*Burden v. Snowden* (1992) 2 Cal.4th 556, 562 [7 Cal.Rptr.2d 531, 828 P.2d 672]; *Russ Bldg. Partnership v. City and County of San Francisco* (1988) 44 Cal.3d 839, 847 [244 Cal.Rptr. 682, 750 P.2d 324]; *Usher v. County of Monterey* (1998) 65 Cal.App.4th 210, 216 [76 Cal.Rptr.2d 274].)

■ According to its statement of purpose, debarment is "a sanction to be imposed only in the public interest for the City's protection and not for purposes of punishment. Debarment is designed to protect the City by ensuring full and open competition by granting awards only to responsible contractors." (§ 22.0801.) The debarment scheme has both a three-year debarment provision and permanent debarment provision. Under section 22.0803(a), the City Council may debar a contractor for three years for a variety of reasons, including unsatisfactory performance of a contract, unjustified refusal to properly perform or complete contract work or warranty performance, or any offense or action that indicates a lack of business integrity and that may directly affect the reliability and credibility of performance of the contractor on future contracts with City. (§ 22.0803(a)(3), (5), (10).) Permanent debarment is governed by section 22.0803(b): "The City Council shall permanently debar any bidder or contractor for a violation of Charter Section 97, and *may* permanently debar such bidder or contractor for a conviction under federal or state antitrust statutes involving public contracts or the submission of bid proposals, *for any corrupt practices involving the administration or award of a contract with the City*, or permanent debarment of the bidder or contractor by another governmental agency."[6] (Italics added.)

The trial court determined that the word "performance" contained in the three-year debarment provision, and the word "administration" contained in the permanent debarment provision, were not synonymous, and apparently concluded that the terms were mutually exclusive. The court stated: "The

---

[6]San Diego City Charter section 97, not applicable here, mandates permanent debarment of a contractor who is guilty of collusion in the bidding process.

drafters of the Municipal Code apparently recognized this distinction because they used the word 'performance' three times in [section] 22.0803(a), the section which allows debarment for a period of up to three years. The word 'administration' is used only once, in [section] 22.0803(b). The court finds the choice of words is significant and that SoCal did not engage in any practices, corrupt or otherwise, involving the administration of contracts. Therefore, there are no statutory grounds supporting SoCal's permanent debarment."

In interpreting the phrase "administration of a contract," we apply principles of statutory construction. ▆▆ Our role in this regard is to ascertain the intent of the Legislature or other enacting body so as to effectuate the purpose of the law. (*Select Base Materials v. Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672].) We first examine the words themselves, seeking to give them their usual and ordinary meaning. (*California Teachers Assn. v. San Diego Community College Dist.* (1981) 28 Cal.3d 692, 698 [170 Cal.Rptr. 817, 621 P.2d 856]; *Lungren v. Deukmejian* (1988) 45 Cal.3d 727, 735 [248 Cal.Rptr. 115, 755 P.2d 299].) If the language is clear and unambiguous, there is no need for construction. However, if the terms of the statute or ordinance provide no definitive answer, we resort to extrinsic sources, including the ostensible objects to be achieved according to the apparent intent of the Legislature. In so doing, we avoid an interpretation that would lead to absurd consequences. (*People v. Coronado* (1995) 12 Cal.4th 145, 151 [48 Cal.Rptr.2d 77, 906 P.2d 1232].) Further, "[w]hile the ultimate interpretation of a statute is an exercise of the judicial power [citation], when an administrative agency is charged with enforcing a particular statute, its interpretation of the statute will be accorded great respect by the courts 'and will be followed if not clearly erroneous. [Citations.]' [Citation.]" (*Judson Steel Corp. v. Workers' Comp. Appeals Bd.* (1978) 22 Cal.3d 658, 668-669 [150 Cal.Rptr. 250, 586 P.2d 564].)

▆▆ The San Diego Municipal Code does not define the phrase "administration of a contract" and thus provides no definitive answer as to its meaning. We therefore look to the usual and ordinary meaning of that term, consistent with the purpose of the debarment scheme. "Administration" is commonly defined as "the act or process of administering; performance of executive duties: management." (Webster's New Collegiate Dict. (9th ed. 1988) p. 57.) "Management" is defined as "the act or art of managing: the conducting or supervising of something (as a business)." (*Id.* at p. 722.) Black's Law Dictionary (6th ed. 1990) at page 44 defines "administration" as "Management or conduct of an office or employment; the performance of the executive duties of an institution, business, or the like." Within the

context of the phrase "corrupt practices involving the administration of a contract with the City," the word "administration" means the "management" or "supervision" of the contract.

"Performance" is defined as "the execution of an action, . . . something accomplished, . . . the fulfillment of a claim, promise or request" (Webster's New Collegiate Dict., *supra*, at p. 873) and "[t]he fulfillment or accomplishment of a promise, contract, or other obligation according to its terms . . . ." (Black's Law Dict., *supra*, at p. 1137.) There is nothing in these definitions to suggest that a contractor that *performs* under a contract cannot, at the same time, *administer* the contract. In this regard, a single contractor may very well carry out both labor and management functions in the execution of a contract.

Here, SoCal's fulfillment of its contractual obligations included performing labor as well as managing or supervising. The evidence showed, and the City Council found, that in five separate instances, on four contracts, SoCal took water from City fire hydrants in a manner that allowed SoCal to avoid paying for it: twice with no water meters, twice with inoperable water meters SoCal had reported as having been lost or stolen, and once with an operable meter SoCal had reported as lost or stolen. SoCal had been notified on several occasions that this practice was improper, yet continued to engage in deceptive practices to make it appear water was being measured. A reasonable inference can be drawn that SoCal, in the management or supervision of its contracts, was intentionally avoiding having to pay for water, in an attempt to reduce its costs and thereby increase its profits.

The evidence also showed two instances in which SoCal falsified traffic permits. In one instance, SoCal added a street name to a preexisting permit to make it appear that the permit covered SoCal's work on that street when in fact it did not. In the second instance, SoCal cut out an "approved" stamp from a previously approved traffic control plan and pasted it onto another plan that had not been approved. Additionally, City documented 11 instances on three contracts in which SoCal either worked in the public right-of-way without having obtained required traffic control permits, or failed to implement proper traffic control, all of which resulted in written violation notices or stop work orders. The City Council concluded that SoCal had falsified traffic control documents and had "repeatedly and egregiously ignored [its] legal and contractual obligation to obtain traffic control permits." It is reasonable to conclude that SoCal's conduct resulted from management or supervisory decisions.

The City Council further found that SoCal had submitted false claims for compensation not owed to it: (1) false daily extra work reports on four

contracts in which SoCal claimed inflated labor rates of $28 per hour rather than the actual rate of $11 per hour; (2) false daily extra work reports on one contract where SoCal physically altered the model number on a backhoe in order to charge a higher rate; and (3) three instances in which SoCal submitted false workers' compensation claims to City's owner controlled insurance program for workers who were not performing work on the site at the time of their injuries as SoCal claimed they were. This conduct is reasonably attributable to management decisions.

Additionally, the City Council found that SoCal deceitfully misrepresented that it had replaced dilapidated sewer laterals. When SoCal was required to excavate one of these laterals, City workers discovered that the work SoCal claimed it had done had not in fact been completed. SoCal then made an unauthorized excavation of other sites in order to attempt to cover up its failure to replace the sewer laterals. This evidence also reasonably implicates SoCal's management or supervisory functions.

The City Council found that each of these four grounds constituted a corrupt practice sufficient to warrant permanent debarment under section 22.00803(b). It further found that all the conduct, "when taken in totality[,] represents a serious pattern of repeated, persistent, and frequent corrupt practices," thus constituting a fifth ground for permanent debarment.

The City Council is the only entity charged with applying section 22.0803(b). We must therefore accord great respect to its interpretation of that provision, and follow it if it is not clearly erroneous. (*Judson Steel Corp. v. Workers' Comp. Appeals Bd., supra*, 22 Cal.3d at pp. 668-669; *Edgar v. Workers' Comp. Appeals Bd.* (1998) 65 Cal.App.4th 1, 9 [76 Cal.Rptr.2d 83].) The City Council's findings are consistent with our interpretation of the term "administration" as used in the permanent debarment provision. SoCal's documented conduct exceeded mere unsatisfactory or improper performance of its contractual duties. Much of the conduct involved policy decisions and cost-cutting tactics that could inure only to the benefit of SoCal as an entity. SoCal's administration of its contracts with City involved supporting, condoning or participating in corrupt practices. The use of deception and falsification emanated from SoCal's role in managing and supervising its contracts. Such corrupt practices warranted the City Council, "in the public interest for the City's protection," to permanently debar SoCal. (§ 22.0801.) In view of all of these findings, the City Council's permanent debarment of SoCal under section 22.0803(b) was not clearly erroneous. The trial court erred in failing to defer to City's determination.

## V

### DISPOSITION

The judgment granting SoCal's petition for writ of mandate is reversed. The matter is remanded to the trial court with directions that the City Council may reinstate its resolution permanently debarring SoCal. In all other respects, the judgment is affirmed. City is entitled to costs on appeal.

Benke, Acting P. J., and McDonald, J., concurred.

A petition for a rehearing was denied May 20, 2003, and the petition of plaintiff and appellant for review by the Supreme Court was denied August 20, 2003. Baxter, J., did not participate therein.